**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>             Plaintiff,<br><br>vs.<br><br>JAMES R. COLLINS AND ROBERT F. DIMEO,<br><br>             Defendants. | Case No. 21-cv-5040<br><br>**COMPLAINT**<br><br>**JURY TRIAL REQUESTED** |

Plaintiff United States Securities and Exchange Commission (the "SEC"), for its Complaint against Defendants James R. Collins ("Collins") and Robert F. DiMeo ("DiMeo") (collectively, "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.     This case involves a securities fraud committed by Defendants Collins and DiMeo in connection with the offer and sale of notes backed by a package of subprime auto loans. The Defendants were the founders and operators of a subprime auto loan funding and servicing company named Honor Finance, LLC ("Honor"). In December of 2016, through a process known as "securitization," Honor packaged together several thousand of its auto loans to serve as collateral for $100 million in interest-bearing notes sold to investors through a specially created trust. As long as the auto loan borrowers made sufficient payments on the underlying loans, investors who purchased the notes would receive monthly payments until the trust fully repaid the principal and interest on the notes. The Honor-sponsored securitization was named the Honor Automobile Trust Securitization 2016-1 ("HATS"). In connection with the offer and sale of HATS notes, Honor, at Defendants' direction, engaged in deceptive conduct when servicing loans in the HATS portfolio, made false and misleading statements related to its loan servicing

practices, and otherwise engaged in a scheme to defraud HATS investors. Defendants also enriched Honor, and through Honor themselves, by misrepresenting the quality of the loans underlying the HATS notes sold to investors.

2. Defendants' fraudulent actions set up HATS as a house of cards which was doomed to fail, and it predictably collapsed when their scheme unraveled. HATS collapsed because, prior to the sale of HATS notes, and unbeknownst to investors, Defendants filled HATS with poorly-performing and delinquent loans they disguised to look like better-performing (*i.e.* more likely to continue to pay rather than default) loans than they really were.

3. Honor perpetrated this fraud chiefly by engaging in two types of undisclosed and impermissible loan modification practices. First, Honor, at Defendants' direction, recklessly and surreptitiously applied essentially fake borrower payments called "Honor Payments" to delinquent loans to make it appear as though borrowers had made payments when they in fact had not. Second, again at Defendants' direction, Honor recklessly, and contrary to its disclosures to investors, unilaterally extended the payment due dates of thousands of otherwise delinquent loans to disguise how far behind the borrowers were on payments. Together, the failure to disclose these impermissible loan modification practices in the offering documents used to market and sell the HATS notes hid credit weaknesses in the HATS loan portfolio and allowed Defendants to pawn off poorly performing loans to HATS investors. Approximately 18 months after the HATS deal was completed, the underlying portfolio of auto loans suddenly— and as far as investors knew, unexpectedly—reported significant losses.

4. Investors purchasing HATS notes did not know about the improper modifications because the materials Honor prepared to market HATS misrepresented Honor's actual loan servicing practices in several respects.

5.     First, Honor falsely represented that, consistent with standard industry practices, Honor granted payment modifications to borrowers only after properly investigating and determining the modification was in the HATS trust's best interest, and no more often than once every three months. In reality, at Defendants' direction and without borrower interaction or the required diligence, Honor recklessly extended loans or used Honor Payments to advance borrowers' payment due dates and make it appear as though their loans were current. Through these improper modification practices, Defendants manipulated Honor's delinquency reporting and avoided making an accounting entry known as a "charge-off" in which loans are written off as a loss because the borrowers are severely delinquent, owe more than the collateral (*i.e.* the underlying vehicle) is worth, and are unlikely to make any future payments.

6.     Second, Honor, through Collins and DiMeo, secretly stuffed more than a thousand poorly-performing loans into HATS by using the improper loan modification practices to make it appear as though the loans satisfied the deal's collateral requirement that no loan be more than 30 days delinquent. If not for these improper loan modification practices, Honor would have been required to replace many of these loans with better performing loans. Moreover, by fraudulently including the bad loans, which had a higher likelihood of default and charge-off, Honor, through Defendants, effectively erased a collateral cushion included in the HATS structure designed to protect investors from losses.

7.     Honor, at the Defendants' direction, continued these same reckless and impermissible loan modification practices after HATS closed. These modifications caused Honor to inaccurately record and report loan delinquencies which, in turn, delayed Honor from timely repossessing vehicles and charging off defaulted accounts in the HATS pool of auto loans. Defendants engaged in these practices to hide further deterioration in the HATS loan pool and

manipulate HATS's cash flow structure to improperly take money from HATS that should have gone to investors.

8.     In addition, Honor's extensive use of improper modifications caused monthly reports Honor published to update investors and others on the performance of the HATS notes to be false or misleading. The monthly reports were misleading as to, among other things, the deal's performance, the underlying loans' delinquency status, and the percentage of the loan pool with extensions during the month. As a result, investors had materially inaccurate information when considering whether to buy or sell HATS notes on the secondary market.

9.     Honor perpetrated this scheme at the direction of, and while under the control of, the Defendants. As co-founder and Chief Executive Officer ("CEO"), Defendant Collins imposed a strict top-down management regime that involved him in virtually every substantive aspect of Honor's operations, including the HATS offering. Despite his knowledge of Honor's actual reckless loan servicing and modification practices, he approved marketing materials for the HATS notes provided to investors that were false or misleading as to those practices. Defendant DiMeo, also a co-founder, the Chief Operating Officer ("COO"), and the Compliance Management Officer of Honor, knowingly provided false and misleading information to be used in the HATS marketing materials and personally directed most or all of the improper loan modifications. At various times, both Collins and DiMeo lied to or misled the HATS underwriter and others who were either preparing materials for the HATS offering or conducting risk assessments of the HATS notes that were important to investors making HATS-related investment decisions.

10.     After the HATS offering, Defendants maintained the scheme through their continued use of reckless loan modification and servicing practices. They concealed their

activities from investors by continuing to deceive the HATS underwriter and others about
Honor's loan modification practices. In addition, DiMeo, with Collins's knowledge, continued to
deceive investors by providing false and misleading information that was included in the
monthly reports on the performance of HATS provided to investors, potential investors, and
others.

11.     Defendants could not use improper loan modifications to disguise the loan pool's
weaknesses and postpone charge-offs forever, and beginning in about December 2017,
Defendants' improper practices began to catch up with them. About that time, HATS first
reported a noticeable deterioration in its loan pool. Several months later, HATS became the first
subprime automobile deal downgraded by the ratings agencies since the 2008 financial crisis.
Anticipating potential losses, in June 2019, the deal's underwriter caused the repurchase of the
remaining HATS notes from investors. Without this intervention, investors would have lost
millions of dollars as the loan pool recognized losses, leaving the deal with insufficient cash
flows to meet its obligations.

12.     As a result of the conduct described herein, Defendants violated and, unless
restrained and enjoined, will continue to violate Section 17(a) of the Securities Act of 1933
("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act of 1934 ("Exchange
Act") [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) &
(c)]. Defendant Collins violated, and unless restrained and enjoined, will continue to violate Rule
10b-5(b) under Section 10(b) of the Exchange Act [17 C.F.R. § 240.1b-5(b).)]. Defendant
DiMeo is liable under Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] for aiding and
abetting Honor's violation of Rule 10b-5(b) under the Exchange Act [17 C.F.R. § 240.1b-5(b). In
the alternative, Defendants are liable under Section 15(b) of the Securities Act [15 U.S.C. §§

77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] for aiding and abetting violations of the aforementioned antifraud provisions of the Securities Act and the Exchange Act committed by Honor. Defendants are, with respect to violations of the Exchange Act, also liable in the alternative as control persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for violations of Sections 10(b) and Rule 10b-5 thereunder, committed by Honor.

13.     To deter additional fraud, recover fraudulently obtained funds, and otherwise enforce the federal securities laws that the Defendants and Honor violated, the SEC seeks permanent injunctions against each of the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint and from violating, directly or indirectly, the laws and rules alleged in this Complaint; disgorgement of all ill-gotten gains from the unlawful activity set forth in this Complaint from each of the Defendants together with prejudgment interest; civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] against both Defendants; and officer and director bars against both Defendants pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]] of the Exchange Act.

## JURISDICTION AND VENUE

14.     The SEC brings this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a)] and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a)]. Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint, including by

making use of the internet to offer securities and sending or receiving interstate email and participating in interstate voice or video calls. This Court has subject matter jurisdiction under Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)], and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

15.     Venue is proper in this district under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. During the relevant period, Honor had its principal place of business in this District in Evanston, Illinois. Defendants also reside in this District.

## DEFENDANTS

16.     **Defendant James Robert Collins**, age 51, is a resident of Evanston, Illinois, and was the co-founder and CEO of Honor until terminated in December 2017. Prior to the HATS issuance, Collins worked with DiMeo for 24 years in the automobile finance and servicing industry. On May 15, 2020, Collins was indicted in the Northern District of Illinois based on allegations that he, along with DiMeo and a third individual, misappropriated approximately $5.3 million from Honor in a different scheme. Collins asserted his 5th Amendment right not to testify substantively when asked questions in the SEC investigation that preceded this action.

17.     **Defendant Robert Frank DiMeo**, age 51, is a resident of Park Ridge, Illinois, and was the co-founder, COO, and Compliance Management Officer of Honor until terminated in May 2018. Prior to the HATS issuance, DiMeo worked for over 24 years with Collins in the automobile finance and servicing industry. DiMeo is also a subject of the indictment described

above. DiMeo also asserted his 5ᵗʰ Amendment right not to testify substantively when asked questions in the SEC investigation.

## RELEVANT PARTY

18.     **Honor Finance, LLC** is a related party that was a privately-held Delaware limited liability company located in Evanston, Illinois, that acquired and serviced subprime auto loans on used vehicles. It funded and serviced the loans that served as the collateral for HATS. At the time of the HATS offering, private equity funds held a majority ownership interest in Honor. Honor opened in 2000 and shut down operations in about August 2018. In August 2018, another servicing company took over responsibility for servicing the HATS loan portfolio.

## FACTS

### I.     BACKGROUND

19.     HATS was a Delaware trust that issued $100 million in notes backed by a pool of subprime motor vehicle retail installment sales contracts (*i.e.* subprime auto loans). Under Honor's credit policies, used car dealers arranged the origination of each loan in the HATS pool before October 31, 2016, the last day loans could be included in the HATS loan pool (the "Cut-Off Date"). As HATS's "sponsor," Honor purchased the loans from car dealers, arranged to set up HATS, sold the loans to HATS, caused the sale of the notes to investors (or noteholders) through the HATS offering, and for a fee serviced the loans on HATS's behalf after the offering closed.

20.     In marketing the notes that HATS would issue, Honor, with the assistance of others, prepared a number of materials that explained the structure of the deal, the nature of the collateral for the notes, its loan servicing practices, as well as the potential risks to investors. These materials included an investor presentation, Offering Memorandum, and the Sale and

Servicing Agreement (collectively the "Offering Materials"). The Offering Materials described, among other things, Honor's responsibilities, procedures, and policies as servicer to the loans collateralizing the HATS notes. Generally, Honor's servicing responsibilities included collecting and processing loan payments, investigating delinquencies, making servicing collection calls, repossessing vehicles, charging off loans, and reporting the loan pool's performance to investors on a monthly basis.

21.     Honor also had written policies and procedures ("P&Ps") in place that governed its servicing practices, including when to give payment extensions, initiate repossessions, and recognize charge-offs of the loans that made up its portfolio. The Offering Materials required Honor to apply these policies faithfully and in the trust's (HATS) best interests.

22.     As CEO of Honor, Collins had ultimate authority over, and was directly responsible for, the content of the Offering Materials. He personally approved the investor presentation, was intimately involved in providing and reviewing information used in the Offering Memorandum, and effectively was the final authority from Honor over the HATS transactions documents, including the Offering Materials. Collins also made the ultimate decision to proceed with the HATS offering.

23.     As is customary in securitizations, as HATS's sponsor, Honor retained an underwriter, referred to here as "Underwriter A," to help set up the HATS offering and market the HATS notes. Generally, an underwriter, for a fee, works with an issuer (*e.g.*, HATS) to structure, price, and sell securities (*e.g.*, the HATS notes). In doing so, underwriters rely on the accuracy and completeness of the information provided to them by the issuer, or, where applicable, sponsors like Honor. Investors, in turn, rely, at least in part, on the underwriter's

work and the accuracy of the offering materials based on the information provided by the issuer or sponsor, when deciding to purchase the issuer's securities.

24.     Prior to the HATS offering, HATS notes were also evaluated by two ratings agencies, referred to here as "Rating Agency A" and "Rating Agency B" (collectively the "Ratings Agencies"). Ratings agencies are third-party entities that conduct diligence on and assign grades or "ratings" to debt securities like the HATS notes. The ratings reflected the HATS notes' risk of default as judged by the Ratings Agencies based on, among other things, their review and analysis of Honor as servicer and the underlying loans as collateral. Many investors use these ratings in making investment decisions. Like Underwriter A, when evaluating HATS the Ratings Agencies relied on information provided by Honor. In connection with rating HATS, Collins and DiMeo both provided information to the Ratings Agencies on behalf of Honor.

25.     The Ratings Agencies rated HATS's $100 million in notes as follows:

| Class | Rating | Note Amount | Interest Rate | Final Distribution Date |
|-------|--------|-------------|---------------|-------------------------|
| A | A | $76.48 million | 2.94% | November 15, 2019 |
| B | BBB | $14.66 million | 5.76% | April 15, 2021 |
| C | BB- | $8.86 million | 8.05% | November 15, 2022 |

26.     The Class A and B notes with "A" and "BBB" ratings, respectively, were considered investment grade, meaning they had a low risk of default. The Class C "BB-" notes were the lowest rated, meaning they had the highest risk of default of all the classes or "tranches" of HATS notes.

27.     HATS notes were issued for sale to investors or "closed" on December 15, 2016 (the "Closing Date"). As noted above, thereafter, each month from January 2017 to about June 2018, Honor published and certified a report called a Servicer's Certificate (a "Monthly Servicer Report" or "MSR"), detailing the performance of the underlying loan pool using several data

points. Investors used the MSRs to monitor the deal's performance and to decide whether to buy

or sell HATS notes. Ratings Agencies also used these reports to conduct regular surveillance

activities designed to ensure the deal performed as expected and to determine whether they

should maintain or adjust HATS's credit ratings.

## II.    HATS'S OFFERING MATERIALS WERE FALSE AND MISLEADING

28.    The HATS Offering Materials were false and misleading because they contained

material misrepresentations and omissions concerning Honor's loan servicing practices, which

negatively impacted the reported quality of the loans used as collateral for the HATS notes.

Specifically, the Offering Materials were false and misleading as to: (A) the conditions under

which Honor provided borrowers with loan modifications and the impact of these modifications

on the HATS loan pool; and (B) the use of modifications to make loans eligible for inclusion as

collateral in the HATS loan pool.

### A.    The Offering Materials Failed to Accurately Describe Honor's Use of Loan Modifications

29.    Subprime automobile loan servicers like Honor use loan modifications, including

payment extensions, in their collections strategy. Extensions allow borrowers to miss one or

more payments—sometimes called a payment holiday—while extending the loan term. The

traditional justification for extensions is that working with the borrower to overcome confirmed

temporary financial problems will ultimately maximize the return on the loan by helping the

borrower continue to make payments. Unlike extensions, which when given under appropriate

circumstances are a recognized industry practice, Honor Payments—where Honor recorded an

entry in its servicing system reflecting the receipt of a payment from the borrower when, in fact,

Honor had received no such payment from the borrower —was unique to Honor and is not a recognized industry practice at all.

30.     The Offering Materials purported to describe Honor's controls over loan modifications. The Offering Materials, however, inaccurately described Honor's actual loan modification practices in several material ways. First, the Offering Materials falsely represented that Honor limited extensions to once every three months. Second, the Offering Materials misleadingly stated that Honor investigated loan delinquencies and granted an extension only after engaging the borrower and determining that an extension was in the trust's best interest. Third, the Offering Materials failed to make any mention of Honor Payments and falsely claimed that no loans in the HATS portfolio had been subject to practices akin to Honor Payments. Fourth, the Offering Materials' disclosures regarding repossession and charge-off timing were false and misleading. Finally, the Offering Materials' statements that Honor applied industry standard controls over its use of extensions or similar modifications was untrue as a result of its reckless, improper, and undisclosed loan modification practices.

> 1)     **The Offering Documents Falsely Represented that Honor Did Not Give Extensions More Frequently than Once Every Three Months**

31.     The HATS Offering Memorandum expressly provided that, "[p]ayment extensions *may be granted* from time to time, *but no more frequently than every three months*." (Emphasis added). The deal's investor presentation, personally approved by Collins, also explained, "[e]xtensions are allowed for *temporary relief to borrowers*. They must be *at least three months apart* and *approved* by the COO." (Emphasis added). Moreover, Honor's P&Ps also expressly required that, "[a]ll extensions must be a minimum of three months apart."

32.     At DiMeo's express direction, Honor, however, regularly granted loan modifications (either extensions or Honor Payments which fundamentally acted like extensions

by advancing the next payment due date on a loan) more frequently than every three months prior to the HATS Closing Date. Servicing data shows that, before the Closing Date, 5% of the loans in the HATS portfolio (735 unique loans) were granted more than one form of modification within three months of each other. Some loans in the portfolio were even granted loan modifications in three consecutive months.

33.     After the HATS closed on December 15, 2016, Honor, at DiMeo's personal direction and with Collins's knowledge, continued to violate this limitation. Honor provided modifications of one kind or another more than once every three months nearly 24,000 times to more than 5,600 unique loans, representing 38% of the loan pool.  These repeated modifications hid the fact that Honor was having trouble consistently collecting payments on a very sizeable portion of the HATS loan portfolio.

**2)     Contrary to its Representations, Honor Did Not Investigate Delinquencies or Engage Borrowers Prior to Applying Thousands of Payment Extensions**

34.     HATS Offering Materials misrepresented that Honor investigated delinquencies and engaged borrowers prior to granting extensions to ensure the extension was in the best interest of HATS. DiMeo provided the information used to draft the Offering Materials' language on loan deferments and extensions and Collins ultimately approved it. In reality, DiMeo, with Collins's knowledge, extended thousands of loans in the HATS pool without reasonably investigating why the borrower failed to make a payment or determining whether the extension was in the trust's best interest.

35.     The Sale and Servicing Agreement, which was incorporated by reference into the Offering Memorandum and available to investors, was Honor's servicing contract with HATS. The Sale and Servicing Agreement specifically required Honor to "substantially comply with [its] Servicing Policies and Procedures" and to investigate delinquencies. It also limited Honor to

using extensions when "the Servicer believes in good faith that such extension, modification or amendment (x) is necessary to avoid a default on such Receivable, (y) will maximize the amount to be recovered by the Trust with respect to such receivable and (z) is otherwise in the best interests of the Trust."

36. Thus, in order to satisfy the standard set out in the Sale and Servicing Agreement, Honor had to engage the borrower, determine why the borrower failed to make a payment, and determine that the extension would help the borrower avoid a default and continue to make payments. If Honor did not undertake this type of investigation, it risked giving extensions to borrowers who planned to "skip," meaning that the borrower had no intention or means to pay the loan going forward. Giving extensions to borrowers that plan to skip would not be in the trust's best interest because such extensions delay the recognition of loan losses and can decrease the recovery on the underlying vehicle, which is a depreciating asset.

37. In addition to the Sale and Servicing Agreement, Honor's P&Ps allowed for an extension only at the request of a customer or at least after Honor had contacted the customer to determine the reason for an extension. As COO and Compliance Management Officer, DiMeo had direct oversight and responsibility over the P&Ps. Honor's P&Ps were provided to Underwriter A and the Rating Agencies with DiMeo and Collins' knowledge and approval. The Offering Memorandum provided to investors also incorporated the Sale and Servicing Agreement and the P&Ps by reference, noting that Honor would grant extensions only in accordance with the Sale and Servicing Agreement and its P&Ps.

38. Honor's P&Ps allowed for only two types of extensions or payment holidays: (1) "Extensions" (called "Allowable Delinquencies" or "ADs" internally at Honor) and (2)

"Payment Deferrals."[1] The P&P section on "Payment Extensions and Deferrals" provided as follows:

> "***A Customer may request*** Honor to Defer or extend the due date of a specific payment ('Payment Deferral' or 'Extension'). A Payment Deferral or Extension moves the due date of a particular payment to a later date. The payment may be past due or due now or in the future. Honor ***may offer*** Payment Deferrals and Extensions ***to help Customers with a record of making timely periodic payments***. A Payment Deferral or Extension provides a Customer ***who has experienced a financial difficulty*** extra time to make the payment" (emphasis added).

39.     In summary, Honor's own servicing policies clearly contemplated that an extension would be granted only after a customer request ("A Customer may request Honor to defer or extend the due date of a specific payment"), or at least after Honor made contact with a customer and determined that the customer had a short term financial need ("Honor may offer Payment Deferrals and Extensions to help Customers with a record of making timely periodic payments. A Payment Deferral or Extension provides a Customer who has experienced a financial difficulty extra time to make the payment.").

40.     Despite the Offering Materials' disclosures and Honor's obligations under the Sale and Servicing Agreement and its own P&Ps, DiMeo ***unilaterally*** applied payment extensions thousands of times to loans in the HATS pool without asking why the borrowers were not making payments, if they had the ability to make payments, or whether they intended to repay the loan. In these instances, Honor failed to reasonably investigate the underlying reason for the delinquencies or determine if the extensions were in the best interest of the trust.

41.     With Collins's knowledge and approval, DiMeo led this unilateral modification process. DiMeo periodically isolated himself in his office, ran and then reviewed loan delinquency reports. During the review, DiMeo made hand-written notations on the reports next

---

[1]The SEC is not alleging misconduct in connection with the application of Payment Deferrals.

to loans indicating whether the accounting department should apply an extension to the loan. The accounting department then used these notes to process the payment extensions in Honor's loan servicing system.

42. Prior to the Closing Date, DiMeo applied nearly 2,400 ADs to more than 1,250 loans in the HATS portfolio. After the Closing Date, DiMeo applied more than 25,000 ADs to more than 6,700 loans in the HATS portfolio. DiMeo commonly used these ADs to push longer delinquencies back into less severe delinquency categories (i.e. from the 60-90 days delinquency category to the 30-60 day delinquency category). A standard AD entered into the loan servicing system excused a single payment. But, DiMeo also applied ADs that excused from two to nine months of non-payment (internally called A2s, A3s, etc.). In other cases, DiMeo directed employees to give ADs to loans on vehicles which Honor had already repossessed and/or even sold at auction.

### 3) Honor Omitted Any Disclosure of Its Use of "Honor Payments," Which Rendered Its Offering Materials False and Misleading

43. The Offering Materials, over which Collins had ultimate authority, make no mention of Honor Payments. As noted above, the Offering Materials and the P&Ps permit only two types of extensions, ADs and Payment Deferrals. Neither the Offering Materials nor the P&Ps contemplated, at all, the use of Honor Payments, whereby Honor essentially entered fake borrower payments into its servicing system to make it appear as though the borrower had made a full payment, when in fact the borrower had not made any payment or made only a partial payment.

44. Moreover, the Offering Materials expressly represented that none of the loans included in HATS had been subject to the very kinds of modifications practices like Honor Payments. Specifically, the Offering Memorandum contained a list of requirements that each

loan supporting the HATS deal needed to satisfy to be included in the pool. These requirements included the following representation:

> "None of Honor Finance, any affiliate, any dealer or anyone acting on its behalf advanced funds to prevent the Receivable from becoming more than 30 days past due."

Honor payments (and ADs) violate this representation because they effectively "advanced" funds for the sole purpose of moving a loan's next payment due date and, in many cases, moved the loans to a less severe delinquency category (*e.g* from 60 days past due to 30 days past due).

45.     Despite these omissions and misrepresentations, DiMeo, with Collins's knowledge and approval, unilaterally applied Honor Payments to thousands of loans. Honor Payments were a secretive process within Honor, and like ADs were applied by DiMeo when he would hole up in his office and conduct his regular reviews of loan delinquency reports. But, unlike ADs, which allowed the borrower to skip a payment while interest continued to accrue, Honor Payments decreased the borrower's loan balance by the amount of principal and interest the borrower failed to repay. Thus, Honor Payments made it appear as though the borrower had made a payment when, in fact, no money was received from the borrower. Honor Payments were effectively Honor excusing the loan payment on behalf of the borrower—almost always without borrowers' knowledge—to give the appearance that the borrower was making loan payments in full and on time. Payment, if any, applied to the loan balance came from Honor. Honor did not require the borrower to make up this payment or add the amount Honor paid to the loan balance. Like ADs these fictitious payments masked problems Honor was having with collecting on HATS loans.

46.     In some cases, Honor Payments added to partial payments borrowers made in order to reach the full payment due amount and avoid a delinquency. DiMeo ran reports showing loans where borrowers made some, but not all, of the scheduled payments. These reports

identified the accounts with the smallest shortfalls needing funding to "roll" the next payment due date to the next month. DiMeo used these reports to identify loans for which he could use Honor Payments to supplement partial payments. By supplementing borrower payments, Honor avoided having to include or advance those loans in the delinquency categories, thereby masking collection problems that would continue to impact the loan pool. Honor also avoided trying to get the borrower to make up the shortfall the following month, which was a requirement to avoid being delinquent. Collins was aware of this practice and defended it to others at Honor prior to HATS issuance.

47.     In other instances, DiMeo used Honor Payments to record complete payments on behalf of borrowers or pay off the balance remaining after the sale of a repossessed vehicle (to avoid charging off the difference).

48.     In addition, in some of these cases, DiMeo used the Honor Payments to circumvent the limitation on giving extensions more than once every three months by applying an Honor Payment before or after an AD.

49.     Prior to the Closing Date, DiMeo applied more than 1,700 Honor Payments to nearly 1,000 loans in the HATS portfolio. After the Closing Date, DiMeo applied around 7,750 Honor Payments to more than 4,500 loans in the HATS portfolio. On more than one occasion, DiMeo admitted to Honor employees that he used Honor payments to improve Honor's reported delinquency statistics.

50.     All told, prior to the Closing Date, Honor granted nearly 4,100 improper loan modifications (ADs and Honor Payments combined) to more than 1,650 loans (11% of the pool on a loan basis), including more than 825 loans that had more than one and as many as 14 improper modifications prior to the Closing Date.

4) **Honor's Repossession and Charge-Off Timing Disclosures Were False and Misleading**

51.     The offering documents indicate that Honor had a practice of timely repossessing, selling and charging off vehicles when borrowers failed to keep up with their payments. Repossessions and charge-offs are commonly accepted and expected industry practices when the borrower does not make the required payments.

52.     Timely repossession is important because the vehicles serving as collateral are depreciating assets.   The investor presentation noted the following: "Generally, repossession efforts are initiated when an account becomes 60-70 days past due, at which point Honor provides the appropriate notices and right to cure periods are allowed to lapse prior to action being taken." The investor presentation also stated that, "[o]n average, Honor auctions vehicles at 100 [days past due] and charges loans off at 184 [days past due]."

53.     The Offering Memorandum noted, "[a]t roughly 60 days after the scheduled monthly payment date, responsibility is shifted back to [Honor's collection agents at its main office] for likely repossession and remarketing."

54.     Timely charge-offs are important also because a failure to properly recognize when a loan should be written-off, among other things, can hide loan losses and skews the flow of payments through a securitization to investors. Honor's Offering Memorandum and investor presentation described when Honor would charge-off (*i.e.*, write off as a default and loss) loans in the pool and included the following:

    i.     [When] More than 5 percent of any scheduled principal payment remained unpaid for more than 120 days from the date of such payment and the related financed vehicle has not been repossessed;

    ii.    At 119 days from the date on which the related financed vehicle was repossessed (or earlier if all expected amounts have been collected); or

    iii.    Otherwise if the loan is deemed uncollectable under Honor's servicing policies.

Just prior to the deal's closing, Collins confirmed the accuracy of these charge-off practices—which did not differ materially from earlier iterations of Honor's charge-off policy—to Underwriter A. Collins also reviewed and approved the statements in the investor presentation.

55.     The HATS deal terms also required Honor to charge-off any loans from the pool balance immediately after the vehicle's sale if the vehicle had been repossessed.

56.     Honor's failure to disclose the unilateral extensions and Honor Payments rendered Honor's repossession and charge-off disclosures false and misleading. Specifically, the extensive use of these modifications delayed triggering repossessions and charge-offs. In reality, because of the modifications, Honor took these steps only after actual loan delinquencies were well beyond the time limits stated in its disclosures and its internal policies. This delayed repossessions and depressed recoveries. This also delayed charge-offs, which caused unrecognized losses in HATS prior to and after closing and skewed the flow of payments through the HATS structure.

57.     DiMeo also delayed repossessions and charge-offs triggered by repossessions through the use of an off-the-books process called "repo control." Under this practice, which Honor also did not disclose, DiMeo delayed classifying a vehicle as repossessed until well after Honor took physical possession of the vehicle. In some cases, Honor did not recognize a car as repossessed until the car had actually been sold. In other cases, DiMeo applied ADs and Honor Payments to loans for which the vehicles had already been repossessed to make it appear as if the loans were still performing (*i.e.,* still being timely paid by the borrower).

58.     Because of these repossession and charge-off delays, over the course of HATS's life, Honor did not repossess vehicles or charge off loans until well after the time tables set forth in the Offering Materials. For example, Honor did not repossess thousands of vehicles until those

vehicles were, on average, seven months delinquent. It then took an additional three to four months to charge those loans off. In these instances, DiMeo used ADs and Honor Payments to mask the loans' true delinquency status and avoid recognizing repossessions and charge offs in accordance with Honor's stated policies and practices.

### 5) Honor Falsely Claimed that its Servicing Policies Met or Exceeded Industry Standard Practices

59.     The Sale and Servicing Agreement required Honor to use "customary and usual procedures of institutions which service motor vehicle retail installment sales contracts" (*i.e.*, industry standard collection practices) and to "substantially comply" with its written servicing policies and procedures.

60.     The general policy statement governing Honor's relevant P&Ps similarly provided that, "Honor uses ***professional and proper practices that meet or exceed industry servicing and collection standards*** for all Accounts" (emphasis added).

61.     While specific policies vary, industry standard loan extension policies do not support Honor's practice of extending loans without contacting the borrower and without taking steps to ascertain the borrower's circumstances and intent. Moreover, industry standard policies do not support Honor's practice of simply entering fake borrower payments using Honor Payments to avoid delinquencies and other negative credit events.

62.     Honor's written P&Ps and the Offering Materials' disclosures require that Honor adopt industry standard practices. But, Honor's actual payment modification practices did not comply with these documents or industry standards. Instead, DiMeo's unilateral loan modifications violated all established industry norms and practices. Likewise, Honor's actual repossession and charge-off practices did not conform to industry standards.

**B.**    **Honor Used Improper Extensions To Put Ineligible Loans Into The Collateral Pool**

63.    Honor's Offering Materials prohibited Honor from putting loans that were more than 30 days past due into the HATS. This is because the probability of future default rapidly increases after that point. As one former Honor employee put it, once a loan became 60 days past due, it was considered "almost dead."

64.    As alleged above, the Offering Memorandum contained a list of requirements that each loan supporting the HATS deal needed to satisfy to be included include in the pool. These requirements, which were designed to ensure a minimum standard for the underlying collateral, included the following representations relating to delinquencies in the collateral pool:

> None of Honor Finance, any affiliate, any dealer or anyone acting on its behalf advanced funds to prevent the Receivable from becoming more than 30 days past due….
>
> No receivable was more than 30 days past due.

Honor's use, at the Defendants' direction, of Honor Payments directly and blatantly violated the provision stating that no loans in the HATS pool had been advanced funds to prevent it from becoming due. In addition, DiMeo's unilateral loan extensions—which he commonly used to move loans from the 60-day bucket to the 30-day bucket—caused loans that were actually more than 30-days delinquent to falsely appear to satisfy these collateral eligibility requirements.

65.    Honor's servicing system would have shown that each of almost 1,500 loans in the HATS pool (about 10% of the loans in the pool) had received ADs or Honor Payments prior to the Cut-Off Date[2] and thus were at least 30 days past due but for the improper loan

---

[2] Again, this was October 31, 2016, the last day loans could be included in the HATS loan pool as distinguished from the Closing Date, December 15, 2016, which was the date HATS closed and the notes were sold to investors.

modifications. If Honor had accurately recorded these delinquencies, these loans would have been ineligible for the pool.

66.     DiMeo's blatant and intentional use of improper loan modification practices to qualify loans for the pool is further demonstrated by the hundreds of last-minute modifications DiMeo applied to loans shortly before the Cut-Off-Date. In the four months preceding the Cut-Off Date (July to October 2016) DiMeo applied impermissible loan modifications (ADs or Honor Payments) to approximately 941 loans valued at over $7.2 million. In October 2016 alone, the last month before the Cut-Off Date, he applied impermissible loan modifications to approximately 377 loans valued at nearly $3 million.

67.     If not for the improper modifications, of which Collins and DiMeo knew, or were reckless in not knowing, these loans would have been more than 30 days past due on the Cut-Off-Date and ineligible for the HATS loan pool. And, many of these loans needed multiple improper modifications, in violation of the limit of one extension every three months, to qualify for inclusion in the HATS pool.

68.     The inclusion of these ineligible loans was material to investors. As stated by a member of the Underwriter A deal team when asked why loans could not be simply be modified to make them current for securitization, he answered:

> I think if you were doing that you'd have a disclosure issue. [. . . .] You'd probably be better off just trying to securitize the [loans that are ] 30-plus [days delinquent] than you would doing that and disclosing it, hey, a month before the deal we extended all these loans and brought them back current. Nobody would buy the deal.

69.     Instead of unilaterally modifying the loans to create the false appearance that they qualified for the HATS loan pool, Honor should not have included them in the pool to begin with. To support the ratings applied to the deal, Honor should have replaced these poorly performing loans with loans that actually met the eligibility requirements. The Ratings Agencies

would not have rated the HATS notes as they did if they were aware of the inclusion of loans that did not meet HATS's stated eligibility requirements. HATS would not have had enough eligible loans to support the structure and justify its ratings.

70. The inclusion of these ineligible loans also eroded the cushion known as "overcollateralization" ("OC") built into the HATS structure to protect investors from loss. HATS was structured to provide investors with certain loss protections, known as "credit enhancements." The OC cushion is a type of credit enhancement that is standard for asset-backed securities, like HATS, and is intended to protect investors from limited losses. HATS had an initial OC cushion of $12.36 million that was created by including $112.36 million in outstanding subprime vehicle loans to back $100 million in debt. The Ratings Agencies considered this initial OC for HATS when assigning ratings to HATS's notes.

71. As noted above, during the four months preceding the Cut-Off Date, Honor, at DiMeo and Collins' direction, made impermissible loan modifications on 941 loans representing $7.257 million of the pool balance. This equates to 58.7% of the deal's total initial OC. To make matters worse, 362 of these loans received multiple extensions during this period.

### C. Defendants Engaged in Additional Deceptive Acts to Conceal Honor's Improper Loan Modification Practices

72. In the lead up to the HATS offering, during Underwriter A's due diligence, Underwriter A asked Honor about its extensions practices. Collins participated in these meetings and was the senior officer representing Honor. During these meetings, Honor falsely represented to Underwriter A that borrowers were given extensions only after Honor verified that the borrower was experiencing "major issues," and that the number of extensions was limited to three over the life of the loans.

73.     In February 2016 meetings with Underwriter A, led by Collins, Honor made the following misrepresentation to Underwriter A:

> Honor uses extensions to assist borrowers who have encountered a temporary hardship. ***Borrowers must show that the hardship is temporary and they must demonstrate the ability to resume normal payment***.[Emphasis added].

74.     During this process, Underwriter A also asked Honor specific questions about its extension policies. In each instance, Honor, primarily at Collins' direction, made statements consistent with the premise that extensions involved borrower interaction and followed standard industry practices. Collins knew these statements were false. For example, in January 2016, Honor's controller had emailed Collins to ask about loans for which there had been no payments in over 365 days, yet were still classified as current as a result of Honor unilaterally applying ADs and Honor Payments. Collins then forwarded this email to DiMeo.  Nevertheless, Collins, in an email written in November 2016 and forwarded to Underwriter A by DiMeo, falsely represented:

> An allowable is an advancement without charge typically due to a car repair and customer problem solution. A deferment is a charge when a dramatic event has not resulted in a delinquency. Both are managed by Rob [DiMeo] and serve the same general purpose and added in statistics.

75.     During all of Underwriter A's diligence, in which detailed and thorough questions were asked specifically about Honor's loan servicing and extension practices and policies, Collins and DiMeo never disclosed Honor Payments at all nor did they disclose their reckless unilateral extension practices.

76.     In addition, during the Ratings Agencies' analyses of HATS, both agencies received copies of Honor's policies, met with Honor, and asked about Honor's servicing practices. From these operational reviews, in which Collins and DiMeo participated, both Ratings Agencies understood that Honor followed its extensions P&Ps and used such extensions

to help borrowers get past verified short term problems in accordance with industry standards. At no point during these meetings or any at other time prior to the HATS offering, did Collins or DiMeo disclose the use of Honor Payments or unilateral extensions. The Ratings Agencies also received an informational PowerPoint presentation describing Honor's operations, policies, and procedures, which Collins reviewed and approved. These presentations contained misleading statements about Honor's servicing and modification practices including, among other things, Honor's extensions, charge-off, and repossession practices.

**D.    The Misrepresentations Regarding Honor's Loan Extension Practices and the Loans Included in HATS were Material to Investors**

77.    All of the misrepresentations and omissions discussed above, regarding Honor's actual loan modification, repossession, and charge-off practices, and the quality of the loans included in the pool, were material to reasonable investors because they concealed the true quality, value, creditworthiness, and performance of the auto loans underlying the HATS notes.

78.    None of HATS's investors, Underwriter A, nor the Ratings Agencies, knew about Honor's practice of granting loan modifications far more frequently than its stated procedures authorized. Nor were they aware of Honor's unilateral extensions without any borrower interaction or the use of Honor Payments. Moreover, as a result of Honor's misrepresentations, neither Underwriter A, the Ratings Agencies, nor investors could have known that Honor had fraudulently included ineligible loans in the pool of loans used to collateralize HATS or that Honor's repossession and charge-off disclosures were false or misleading.

79.    Had Honor been forthright and not concealed its actual loan servicing practices or the quality of the loans it included in the securitization, the HATS securitization may not have happened at all. At a minimum, HATS would have been structured differently (*i.e.,* with different tranche sizes and ratings), included only eligible collateral, and HATS's Offering

Materials would have disclosed Honor's actual servicing practices as well as the risks these practices posed to HATS's performance.

80.     The number and type of extensions Honor applied rendered the servicing agreement between Honor and HATS ineffective. The loans given extensions without borrower involvement and engagement involved a much higher level of risk than contemplated by the offering's underlying structure as described in the Offering Materials (*e.g.*, because many of the loans included were ineligible). As a result, the undisclosed practices materially increased the risk to investors because, for example, the loans were of a lower quality than loans that were current in payments or extended after proper diligence.

81.     Similarly, knowledge of Honor's loan modification practices directed by the Defendants would have materially impacted the Ratings Agencies' ratings of HATS's notes. Both agencies confirmed that it is important and standard industry practice for extensions to be borrower driven; the borrower should show a desire to stay in the loan and a commitment to repay. Witnesses from the Ratings Agencies had never heard of any servicer engaging in conduct resembling Honor Payments. If the Ratings Agencies knew that Honor was not following its stated policies and granting unilateral ADs and Honor Payments, they may not have rated HATS at all. Many investors depend on ratings in making their investment decisions.

82.     Likewise, investors would have wanted to know about Honor's improper loan servicing and modification practices and their impact on the quality of the loans in HATS portfolio. Instead, Honor intentionally and recklessly misled investors about Honor's loan servicing practices and the strength of the underlying HATS loan collateral by the misrepresentations and omissions in the Offering Materials. Investors may not have invested in HATS notes if they had been aware of Honor's actual practices.

III.    **AFTER THE HATS OFFERING, DEFENDANTS' CONTINUED RECKLESS LOAN MODIFICATION PRACTICES CAUSED HATS'S REPORTING TO BE FALSE AND MISLEADING**

A.    **The Role of Monthly Servicer Reports in the Secondary Market**

83.    After the HATS securitization closed, the HATS notes could be bought and sold by other investors on what is known as the secondary market. HATS notes traded in the secondary market after the securitization closed in December 2016 until at least November 2018.

84.    As described above, each month Honor published a Monthly Servicer Report or MSR detailing the performance of the deal using certain data points, including (a) collections and remittance activities under the deal's cash flow structure, (b) pool balance, (c) note balance, (d) extensions, (e) delinquencies, (f) repossessions, (g) OC levels, and (h) charge-offs.

85.    Investors used MSRs to monitor the deal's performance and to decide whether to buy, sell or hold HATS notes on the secondary market. The Ratings Agencies also used the MSRs to monitor whether the HATS notes performed as expected or whether they needed to take ratings actions (*e.g.,* update the ratings they assigned to HATS's notes).

B.    **Defendants' Use of Improper Loan Modifications Caused the MSRs to be False and Misleading**

86.    Honor reported the number of extensions it made in the MSRs. At the peak, Honor disclosed in an MSR that it had extended payments on approximately 22% of the entire loan pool in a single month. This reporting, however, materially underreported actual modification rates because Honor excluded Honor Payments from the MSR extension statistics and, at Defendants' direction, dramatically accelerated its use of impermissible modifications (both ADs and Honor Payments). As shown in the chart below, in late 2017, Honor unilaterally extended between 2,000 and 2,500 loans each month.  Overall, after the the Closing Date, Honor, at DiMeo's direction, modified (using both ADs and Honor Payments) more than 7,000

- 28 -

individual loans more than 33,000 times. This included more than 5,600 loans that received at least two extensions within three months.



87.     Honor Payments were not disclosed anywhere in the MSRs. If Honor had included Honor Payments in the MSR extension statistics, the reported extension rates would have been approximately 3.1% - 8.1% higher, depending on the month.

88.     In addition, the reckless use of both ADs and Honor Payments caused Honor to understate the length of delinquencies (*e.g.,* by preventing loans from going from 30 days past due to 60 days past due) for loans. This metric was important to investors because the likelihood of a loan being repaid decreases significantly as the length of the delinquency increases. Once a loan is 60 days past due, a borrower has more difficulty curing the growing delinquency and the loan often will progress to 90 and then 120 days past due. Honor's failure to let loans flow naturally from one delinquency category to another caused a disproportionate number of loans to show up in the 30-day delinquent category relative to further delinquency categories (*e.g.* 60, 90,

or 120-day delinquencies), which emerged when Honor could no longer mask these loans' poor performance with reckless extensions. Indeed, because of the significance of the 30-day delinquencies observed, at least one investor asked Collins about the delinquency metric when reviewing the MSRs, but Collins avoided providing a substantive response.

89.     Lastly, Honor also misstated its performance data in the MSRs because it failed to charge-off loans as required by the HATS offering documents. As noted in Paragraphs 51 and 58 above, the Offering Materials set forth conditions requiring charge-offs. Honor's improper extensions and repossession delays prevented loans from meeting these conditions. These delays in the charge-offs artificially inflated the HATS pool balance and affected the OC calculations set forth in the MSRs.

### D.     Defendants Continued to Engage in Deceptive Acts to Conceal Its Loan Modification Practices

90.     As noted above, neither investors, the Rating Agencies, nor Underwriter A knew that Honor unilaterally gave borrowers loan modifications. The first indication of an issue did not come until July 2017, when an Underwriter A diligence team visiting Honor made the discovery. When confronted by Underwriter A about the Honor Payments, both DiMeo and Collins lied about the source and purpose of these payments. DiMeo initially told Underwriter A that Honor Payments were actual payments from automobile dealers to Honor, which was false. DiMeo later refused to answer additional questions, and said Underwriter A needed to direct any further questions about Honor Payments to Collins. Collins later doubled down on DiMeo's initial, false explanation that dealers funded Honor Payments, for example, when a borrower had missed a loan payment. Ultimately, a member of the Underwriter A deal team told Collins and DiMeo: "You essentially have no collection policy because of the exceptions." The Underwriter A representative memorialized this conversation in writing, stating, "[a]t that point, I told the

company that their use of ADs and DPs [Honor Payments] even if approved by a senior officer, rendered their collection policy meaningless. I told them that they needed to come back with a collection policy which was more closely aligned with industry standards and greatly curtailed their use of extensions."

91.    After Underwriter A discovered Honor Payments, Underwriter A's relationship manager to Honor had a conversation with Collins in which Collins said Honor would discontinue the use of Honor Payments. However, some six months later, in January 2018, an Underwriter A consultant found Honor had continued to use Honor Payments despite Collins's promises to the contrary. As the data in the chart included in Paragraph 88 above shows, Honor continued to apply Honor Payments to the HATS pool until approximately April 30, 2018 (the last full month DiMeo worked at Honor before he was terminated). When confronted by a member of the Underwriter A team about the continuing practice, DiMeo lied and said that Underwriter A's relationship manager said Honor Payments could continue. Underwriter A's relationship manager later confirmed that he never agreed to allow Honor Payments to continue.

92.    Collins also directly misled at least one investor about Honor's loan modification practices. In August 2017, DiMeo shared reports showing proposed Honor Payment activity with Collins and asked him to "review and advise." Despite having this information, Collins failed to disclose information about Honor's servicing practices, even when an investor asked him why delinquencies were not advancing from the 30-day delinquency category to the 60-day delinquency category. Collins gave a vague non-response, but assured the investor that Honor remained "very encouraged" by the performance of the pool.

**D.      The Post-Offering Misrepresentations Were Material to Investors**

93.      The false and misleading statements and omissions in the MSRs resulting from Honor's improper and fraudulent loan servicing practices were material to investors because the MSRs were the primary means by which investors and potential investors evaluated the performance of the HATS notes. The performance metrics reported in the MSRs were thus critically important to HATS investors or potential investors.

94.      Investors would have wanted to know that the extension rates reported in the MSRs did not include Honor Payments and, as a result, misleadingly underreported loan modifications and the number of loans experiencing collections problems, when deciding whether to purchase or sell HATS notes.

95.      Investors would have wanted to know that the MSRs' reported loan delinquency durations were false, as a result of Honor's loan servicing practices, when deciding whether to purchase or sell HATS notes.

96.      Investors would have wanted to know that the MSRs' charge-off and repossession rates were not accurate, as a result of Honor's loan servicing practices, when deciding whether to purchase or sell HATS notes.

97.      Investors would have wanted to know that Honor's loan servicing practices skewed the reported HATS pool balance and OC calculations in the MSRs, when deciding whether to purchase or sell HATS notes.

98.      Investors would have wanted to know that, by skewing the metrics in the MSRs, Honor diverted cash flows from HATS that should have paid down principal on investors' notes but instead went to Honor as the holder of a residual interest in the deal, when deciding whether to purchase or sell HATS notes.

99.     Investors would have wanted to know that the Ratings Agencies could not properly monitor HATS's performance and, if necessary, take timely ratings actions because the MSRs incorrectly reported performance information used in these activities, when deciding whether to purchase or sell HATS notes.

## IV.     THE SCHEME FALLS APART

### A.     The Consequences of Honor's Improper Loan Servicing Practice

100.     Up until late 2017, HATS's reported loss performance roughly matched the expected loss performance. But, beneath the surface, and as a result of improper and reckless loan modification and servicing practices, the HATS loan pool had millions in unrecognized loan losses. Around the same time, in December 2017, Underwriter A's findings reached Honor's majority owners and the unsustainability of the improper loan servicing practices began to catch up with Defendants, Honor, and HATS. The MSRs began reporting that the loans collateralizing HATS began underperforming expectations as set out in the Offering Materials, and the potential for investor losses significantly increased.

101.     That same month, December 2017, following Underwriter A's discovery of Honor's impermissible loan modification and servicing practices and their relaying of that information to Honors' majority owners, Collins was terminated as CEO.

102.     By April 2018 the reported losses exceeded expected losses by nearly six percent (11.65% projected versus 17.63% actual) or 151% of expectation. The graph below shows one of the Ratings Agencies' view of the sudden divergence beginning in about December 2017 between the performance reported in the MSRs and the expected performance.



103. The Ratings Agencies noticed the deterioration in the HATS portfolio. On April 18, 2018, Rating Agency A wrote, "[a]t this point, it appears that losses are trending significantly worse than originally expected." It therefore placed HATS Class C notes on "Watch Negative" meaning it had a negative outlook for the HATS notes' then current credit rating and may have to lower the notes' rating in the future.

104. By July 17, 2018, Rating Agency A downgraded the Class C rating from its original BB- rating to CCC+. When downgrading the rating, Rating Agency A wrote:

> The 60+ day delinquencies have been increasing since March 31, in response to the company adopting a less liberal approach to extensions. Extensions had been growing and reached a peak of 20%-22% from October 2017 through January 2018. [. . . .] The historically high level of extensions, which we believe is outside industry norms, coupled with elevated delinquencies, led support, in our view, to losses being more back-loaded that normally observed in most subprime auto loan ABS transactions.

105. On May 23, 2018, Rating Agency B also placed the Class C HATS bonds on Watch Downgrade. On July 24, 2018, Rating Agency B downgraded the Class C notes from BB- to CCC+. In doing so, Rating Agency B noted "HATS 2016-1 has been granting higher extensions rates than we have seen in other subprime deals; however; the Company has recently revised its extension policy to make it more industry standard."

106.    Notably, Rating Agency A's and Rating Agency B's reports relied on the extensions reported in the MSRs which did not include Honor Payments. This implies that the impact of Honor's impermissible loan modifications on the HATS notes would be larger than either agency anticipated.

### B.    These Events Triggered More Internal Changes at Honor

107.    In April 2018, the majority owner of Honor brought in a consultant with significant experience in the subprime lending industry to run Honor. This consultant immediately spotted inconsistencies in Honor's loan portfolio. He observed that delinquencies had spiked upward but that realized losses decreased over the same period. His observations raised concerns that Honor may have concealed significant losses in its serviced loan portfolio that posed a risk of loss for investors in HATS.

108.    Further investigation revealed that Honor had deliberately underreported loan losses. In the consultant's opinion, these losses resulted, from among other things, the fact that Honor did not seem to have any rules controlling the granting of payment extensions to customers. Taken together, he concluded that Honor had used ADs and Honor Payments to keep its loan delinquencies and loan losses below certain thresholds. When the consultant confronted DiMeo about these practices, DiMeo turned defensive and said, "this is how we've always done it" and that "Jim [Collins] wanted it this way."

109.    In May 2018, the majority owner of Honor terminated DiMeo. In August 2018, Honor resigned as servicer for the HATS portfolio and a new servicer took over its responsibilities.

110.    As loan losses accumulated and the lowest tranche of HATS neared losses in principal, in June 2019 at Underwriter A's request, the new servicer exercised a "cleanup" option

to purchase the remaining HATS bonds from investors. Without the intervention, investors would have lost millions of dollars on the notes they held.

## V.      COLLINS AND DIMEO ACTED WITH SCIENTER

111.    Despite repeated opportunities to come clean, neither DiMeo nor Collins disclosed Honor's true loan modification and servicing practices prior to HATS's closing. These opportunities included meetings over several months and other interactions with Underwriter A and in person, face-to-face meetings with representatives of the Ratings Agencies.

112.    Collins and DiMeo admitted to Honor's use of unilateral extensions only after they got caught by the Underwriter A diligence team in 2017. But, even after getting caught, both Defendants lied about the true nature of Honor payments. In addition, Honor continued to apply Honor Payments after Collins told Underwriter A they would stop.

113.    Collins knew that Honor classified loans as current even when borrowers had not paid for long periods of time. As noted above, in January 2016, Honor's controller emailed Collins to ask about loans that had ADs, but had not made payments in over 365 days, and were still classified as current. Yet, when structuring the HATS deal, Collins told Underwriter A that ADs were a result of customer-driven issues.

114.    Collins also knew that loans given multiple and frequent extensions were risky. For example, in May 2017, Collins wrote "we build 2 months of mods into our loan [. . . .]  After two extensions we are rolling the dice trying to manage the carnage."

115.    Post-securitization, in August of 2017, DiMeo shared reports showing potential Honor Payment activity with Collins, asking him to "Please review and advise[,]" and to confirm that "this is what you want and how much you want done to it." Despite having this information, Collins failed to disclose it, even when an investor specifically asked him about unexpected

delinquency figures that were directly attributable to Honor's impermissible loan modification and servicing practices.

116.    Collins was also aware of the use of Honor Payments throughout the entire period in lead up to HATS until his termination. For example, Collins and Honor's then CFO discussed Honor Payments.  In this conversation, Collins told the CFO that Honor could make at least partial payments for borrowers. In addition, when confronted by Underwriter A in 2017, he defended the use of Honor Payments.

117.    DiMeo determined which loans received ADs and Honor Payments. DiMeo told Honor employees that the reason he used Honor Payments was to keep loans from going delinquent and to improve Honor's delinquency statistics.

118.    As head of Honor's servicing function, DiMeo was also responsible for the servicing system, the source of the servicing data contained in the MSRs. He therefore knew or was reckless in not knowing that the MSRs would contain the misrepresentations described above in light of Honor's servicing practices.

119.    Moreover, in conversations DiMeo had with Underwriter A, DiMeo showed that he knew about the misrepresentations regarding servicing practices in the HATS Offering Materials. He also directly misstated information about Honor's servicing practices, or was present and did not correct others who misstated or omitted material information, in meetings with Underwriter A and the Rating Agencies.

120.    Furthermore, given their long careers in the subprime auto industry, both Collins and DiMeo knew, or were reckless in not knowing, about the increased credit risk inherent in loans with multiple extensions, and therefore that their misconduct harmed investors. Both of them also understood that Honor profited from selling loans to HATS at the time of the

securitization, and that the impermissible modifications would enhance Honor's profit from its residual interest.

121.    Collins and DiMeo anticipated that Honor would continue raising funds through future securitizations, the success of which largely depended on positive performance in HATS. Indeed, before Honor failed, Collins and DiMeo were planning another securitization for 2017 that never closed.

## VI.    HONOR AND DEFENDANTS PROFITED FROM THEIR MISCONDUCT

122.    Honor profited from its misconduct in at least two ways: (A) selling ineligible loans to HATS; and (B) receiving excess cash flows from the HATS deal that should have been used to pay down notes and enhance the OC. Because they received bonuses based on Honor's profits, Defendants also profited from this misconduct.

### A.    Honor Profited by Including Ineligible Loans in the Portfolio

123.    At the time of the securitization, Honor contributed the underlying loans, which it had obtained at a discount, to HATS at par. For example, if a borrower had an outstanding principal balance on the loan at inception of $10,000, Honor may have acquired it for $9,250. Upon sale to HATS, Honor would have made an immediate profit. Since Honor should not have included ineligible loans in the portfolio (*i.e.*, those improperly extended prior to the Cut-Off Date), its profit from selling these loans to HATS was improper.

124.    Moreover, Honor also profited by including loans in the pool that were of lower quality than represented. Specifically, loans modified under Honor's undisclosed servicing policies were riskier and worth less than loans extended under industry-standard policies. Because Honor's reckless extensions were not disclosed, these loans were sold to HATS at an amount that exceeded their true value, thereby also increasing Honor's profits.

125.   If outside parties had identified the ineligibility of included loans before securitization, Honor would have needed to replace those bad loans with ones actually meeting the collateral eligibility requirements. By extending the loans prior to the securitization, and failing to disclose their ineligibility, Honor had the chance to pass bad loans off to HATS and its investors, and retain better loans for itself.

**B.     Honor Used Improper Loan Modifications to Delay Charge-Offs and Improperly Extract Money from HATS**

126.   Honor's use of improper loan modifications delayed the recognition of loan losses in the HATS portfolio, which affected the flow of monies through the structure of the deal, inflated the reported OC on HATS notes, and enabled Honor to profit at the expense of investors.

127.   As noted in Paragraph 70 above, when HATS closed, it started with an initial overcollateralization of 12.36% (or $12.36 million more in auto loan receivables than the $100 million in notes issued). The OC served as a cushion to protect investors from potential loan losses – *i.e.,* there were $112.36 million in loans securing $100 million in notes. HATS was designed to grow the OC protection for investors over time by using the "excess spread" between the very high interest rates on the subprime vehicle loans and the much lower interest due on the HATS notes. Because of this difference in interest rates, Honor anticipated collecting more money from the subprime loan borrowers each month than was necessary to pay HATS investors and monthly expenses. HATS was required to apply this "excess spread" to increase the OC over time by paying down principal on the investors' notes. This approach to applying the excess spread was required to continue until HATS reached its target OC of 20.5% of the outstanding note balance. If HATS met and maintained its 20.5% OC target, any excess monies were released to Honor, which held the residual interest in HATS.

128.    HATS purportedly hit its 20.5% OC target in May 2017 and maintained it between May and November 2017. During this period, as described above, Honor accelerated its use of improper modifications. Honor received $5.6 million in excess monies that flowed to it through the HATS cash flow structure. However, because HATS calculated the OC target by comparing the outstanding balance of the loan pool to the outstanding note balance, Honor's delays in recognizing loan losses (as a result of the improper modifications) inflated the reported pool balance and allowed HATS to purportedly meet the OC target for some or all of this period.

### C.    Collins and DiMeo Also Profited from this Misconduct

129.    Both Collins and DiMeo received bonuses that were calculated based on Honor's profits. Since their misconduct increased Honor's profits, it also increased their own bonus amounts.

## VII.    DEFENDANTS CONTROLLED HONOR DURING THE RELEVANT PERIOD

130.    Collins and DiMeo founded Honor in 2000. Although they sold Honor to private equity funds in 2011, Collins and DiMeo continued to control virtually all aspects of Honor's operations until they were terminated in December 2017 and May 2018, respectively.

131.    Collins, as CEO, oversaw all of Honor's business activities and operations. Former employees said nothing at Honor occurred without his knowledge and approval. They said Collins maintained a tight "chain of command" where people were told to stay in their lanes and only report upward to their managers. He admonished employees who communicated outside their chain of command or across the department siloes at Honor. Since Collins was CEO, everyone at Honor reported up the management chain to Collins.

132.    Collins was integral to all aspects of the offering and approved the Offering Materials. Collins also managed discussions with the underwriters, rating agencies, and investors in HATS.

133.    Collins directly supervised DiMeo, who personally applied the Honor Payments and improper loan extensions with Collins' knowledge and approval.

134.    DiMeo held the title Chief Operating Officer and also acted as Honor's Compliance Management Officer. He controlled all aspects of Honor's loan servicing and collections activities. The servicing and collections teams—including accounting personnel entering loan transactions into the servicing database and call center employees responsible for telephoning borrowers to collect payments—all reported to DiMeo.

135.    DiMeo had direct oversight and control over the loan servicing information and data included in the Offering Materials and MSRs.

## FIRST CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities—Violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)]

136.    The SEC realleges and incorporates by reference Paragraphs 1 to 135, as though fully set forth herein.

137.    By virtue of the foregoing, from no later than December 2016 through at least their terminations from Honor in December 2017 and May 2018, respectively, Collins and DiMeo have, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (1) employed a device, scheme, or artifice to defraud with scienter; (2) obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading, and (3) engaged in transactions, practices or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

138.   Accordingly, Defendants violated and, unless restrained and enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### (In the Alternative)

### Fraud in the Offer or Sale of Securities—Aiding and Abetting Honor's Violations of Securities Act Section 17(a)
### [15 U.S.C. § 77q(a)]

139.   The SEC realleges and incorporates by reference Paragraphs 1 to 135, as though fully set forth herein.

140.   By virtue of the foregoing, Honor, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (1) employed a device, scheme, or artifice to defraud with scienter; (2) obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (3) engaged in transactions, practices or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities. Accordingly, Honor violated of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

141.   By virtue of the foregoing, Defendants were aware that their actions were part of an overall course of conduct that was improper or illegal and provided substantial assistance to Honor in the violation of securities laws.

142.   Accordingly, Defendants aided and abetted and, unless restrained and enjoined, will again aid and abet, violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

### Fraud—Violation of Exchange Act Section 10(b) and Rules 10b-5(a) & (c) Thereunder
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a) & (c)]

143.    The SEC realleges and incorporates by reference Paragraphs 1 to 135 as though fully set forth herein.

144.    By virtue of the foregoing, from no later than December 2016 through at least their terminations from Honor in December 2017 and May 2018, respectively, Collins and DiMeo directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (i) employed devices, schemes or artifices to defraud; and (ii) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon another person.

145.    By reason of the conduct described above, Defendants, directly or indirectly, violated, and unless restrained and enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) & (c)].

## FOURTH CLAIM FOR RELIEF
### (Against Defendant Collins)

### Fraud—Violation of Exchange Act Section 10(b) and Rule 10b-5(b) Thereunder
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b)]

146.    The SEC realleges and incorporates by reference Paragraphs 1 to 135 as though fully set forth herein.

147.    By virtue of the foregoing, from no later than December 2016 through at least his termination from Honor in December 2017, Collins, directly or indirectly, acting with scienter,

by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of

a national securities exchange, in connection with the purchase or sale of a security, made untrue

statements or omitted to state material facts necessary in order to make the statements made, in

the light of the circumstances under which they were made, not misleading.  By reason of the

conduct described above, Collins, directly or indirectly, violated, and unless restrained and

enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule

10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### FIFTH CLAIM FOR RELIEF
#### (Against Defendant DiMeo)

**Fraud — Aiding and Abetting Honor's Violations of Exchange Act Section 10(b)
and Rule 10b-5(b) Thereunder
[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b)]**

148.    The SEC realleges and incorporates by reference Paragraphs 1 to 135 as though

fully set forth herein.

149.    By virtue of the foregoing, Honor, directly or indirectly, acting with scienter, by

use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a

national securities exchange, in connection with the purchase or sale of a security, made untrue

statements or omitted to state material facts necessary in order to make the statements made, in

the light of the circumstances under which they were made, not misleading.  Accordingly, Honor

violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-

5(b)].

150.   By virtue of the foregoing, DiMeo was aware his actions were part of an overall

course of conduct that was improper or illegal and provided substantial assistance to Honor in

the violation of securities laws.

151.    Accordingly, DiMeo aided and abetted and, unless restrained and enjoined, will again aid and abet, violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

**SIXTH CLAIM FOR RELIEF**
**(In the Alternative as to Defendant Collins)**

**Fraud—Aiding and Abetting Honor's Violation of Exchange Act Section 10(b) and Rules 10b-5 (a), (b) & (c) Thereunder**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**

152.    The SEC realleges and incorporates by reference Paragraphs 1 to 135, as though fully set forth herein.

153.    By virtue of the foregoing, Honor, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person. As a result, Honor violated Section 10(b) of the Exchange Act and Rules 10b-5 (a) –(c) thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 (a) – (c)].

154.    By virtue of the foregoing, Collins was aware that his actions were part of an overall course of conduct that was improper or illegal and provided substantial assistance to Honor in the violation of securities laws.  Accordingly, Collins aided and abetted and, unless restrained and enjoined, will again aid and abet, the violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

## SEVENTH CLAIM FOR RELIEF
### (In the Alternative as to Defendant DiMeo)

### Fraud—Aiding and Abetting Honor's Violation of Exchange Act Section 10(b) and Rules 10b-5 (a) & (c) Thereunder
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 (a) & (c)]

155.    The SEC realleges and incorporates by reference Paragraphs 1 to 135, as though fully set forth herein.

156.    By virtue of the foregoing, Honor, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person. As a result, Honor violated Section 10(b) of the Exchange Act and Rules 10b-5 (a) and (c) thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 (a) & (c)].

157.    By virtue of the foregoing, DiMeo was aware that his actions were part of an overall course of conduct that was improper or illegal and provided substantial assistance to Honor in the violation of securities laws.

158.    Accordingly, DiMeo aided and abetted and, unless restrained and enjoined, will again aid and abet, the violations of Section 10(b) of the Exchange Act and Rules 10b-5 (a) and (c) thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

## EIGHTH CLAIM FOR RELIEF
### (In the Alternative)

### Fraud—Control Person Liability under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Honor's Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

159.    The SEC realleges and incorporates by reference Paragraphs 1 to 135, as though fully set forth herein.

160. By virtue of the foregoing, Honor, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person. Therefore, Honor violated of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

161. As alleged herein, Defendants, exercised general control over Honor as well the power and ability to control Honor's specific actions, statements, and/or omissions that constituted violations of the securities laws.

162. Accordingly, Defendants are liable as control persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Honor's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

**RELIEF SOUGHT**

**WHEREFORE**, the SEC respectfully requests that this Court:

**I.**

Find that each of the Defendants committed the violations alleged in this Complaint;

**II.**

Enter an injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each of the Defendants from violating, directly or indirectly, the laws and rules they are alleged to have violated in this Complaint;

**III.**

Order that Defendants be permanently prohibited from acting as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) [15 U.S.C. § 78u(d)(2)] of the Exchange Act;

**IV.**

Order that each of the Defendants disgorge any and all ill-gotten gains, together with pre-judgment interest, derived from the improper conduct set forth in this Complaint;

**V.**

Order that each of the Defendants pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; and

**VII.**

Grant such other relief as this Court may deem just or appropriate.

**<u>JURY DEMAND</u>**

The SEC demands a trial by jury on all claims so triable.

Respectfully submitted this 23rd day of September 2021.


By:     /s Jonathan S. Polish

Jonathan S. Polish
U.S. SECURITIES & EXCHANGE COMMISSION
175 W. Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-6884
 polishj@sec.gov

Attorney for the Plaintiff


Of counsel
David A. Nasse (*pro hac vice* motion to be filed)
U.S. SECURITIES & EXCHANGE COMMISSION
100 F Street N.E.
Washington, DC 20549
(202) 551-4426
nassed@sec.gov

Christopher E. Martin (*pro hac vice* motion to be filed)
U.S. SECURITIES & EXCHANGE COMMISSION
Byron Rogers Federal Office Building
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
(303) 844-1106
martinc@sec.gov